Good morning, Your Honors. May it please the Court, my name is Jay Brakestone. I represent the plaintiffs Humphrey and Bereri, and I'll be reserving five minutes with the Court's permission. These cases present to the Court as 12B6 motions made by defendants Remington. And so all factual allegations, as the Court is well aware, and the complainers, and all inferences are to be drawn in favor of the plaintiffs. The complaint alleges fraudulent concealment. And that fraudulent concealment had deadly effect. And the fraudulent concealment was, in fact, fraudulent concealment of a deadly defect on Remington rifles, as the Court might know. We're talking about an iconic American firearm. And that's part of the problem. Because, in fact, since 1947, Remington knew that its weapon misfired. Is there any duty on the part of Remington to disclose his knowledge to the public? There's probably not a duty on behalf of Remington to disclose. But that's not really what's involved here. We're not talking about disclosure. We're talking about active, fraudulent concealment. Disclosure would really mean not saying anything. But when you actively move forward and conceal facts, and you do it aggressively... And how was it actively concealed? Well, it was actively concealed in a number of ways. How was it alleged in the complaint? Yes, it was alleged in the complaint. Where was it alleged? I don't have the specific page references, but the complaint is rather prolix when talking about Remington, in fact, settling cases with confidentiality agreements. Number two, getting protective orders on discovery. This is active concealment. Now, even though, even though it could be argued... What's your best authority to say that those kind of actions are active concealment? Well, I don't think I really have any authority that says that. I think that this is a unique case because we have such a long period of time and such a high number of incidents. We're talking incidents that, at least in the past 13 years, were five a day of complaints. And this... Mr. Briggs, I have a question that may be out of order in your presentation, but has been bothering me as I consider the complaint. At page 33 of the complaint, in paragraph 18, the allegations are made as to what was dangerous and defective as to the rifle, which I summarize as being the Walker fire control system, which operated with two parts. And you lay out what was wrong about the rifle, what was defective about the rifle, and why this defect produced the unexpected misfiring of the guns in the two instances that are involved in this case. My question is this. If this information came to you as a result of the CNBC program, what was stopping investigators for the plaintiffs in 1989 and later when the second incident occurred from discovering this defect on their own? Well, I think that it's good to take that question out of order. It's essential. And let's get that out of the way. All right. This might sound trite, but we're taught from a very young age to believe that accidents happen. And our first thought on a firearm discharging is that somebody did something wrong, that somebody being the person who held the weapon. So these two plaintiffs operating from that position had no reason to know to make an inquiry, none. Now, remember, we're dealing with no discovery. We're dealing with no fact pattern right now other than what's in the complaint. But both guns misfired, right? I'm not supposed to ask Your Honor questions, but let's talk about the term misfire. Well, misfiring means a gun firing when there isn't an intentional activation of the trigger. That's what I mean by misfiring. But all the plaintiffs knew here, Your Honor, is that the gun fired when it wasn't supposed to. They knew that. So if they knew the gun fired when it wasn't supposed to, what barrier was then to investigating the reason for the, what I call, misfiring, or not supposed to firing that stopped them from discovering what CNBC discovered some years later? Because the first reaction of somebody when a gun fires when it doesn't supposed to is to blame the person who has the gun in his hand. Well, that would be so for CNBC. They didn't do that. CNBC had a lot more to go on than we have in this complaint. In fact, did CNBC have to go on, which was not available to a diligent investigator in 1989? Who knew to look, you mean, Your Honor? You see, that's the problem. A diligent investigator says the gun misfired. It must have misfired for a reason. And then you go through the possible mechanisms for it misfiring. My question again to you is, was there a, did Remington do anything to prevent an investigator from finding out why the gun misfired in 1989? Well, assuming, and I have to make assumptions here because I don't know what led CNBC to its series. I think it was the actions of one plaintiff somewhere else whose situation might have been totally different and whose reason for asking the question might have been totally different. But as to these plaintiffs, and Your Honor can take a look at, Lawrence can take a look at the fact patterns here. They're, one gun, one rifle is being cleaned. One rifle is somebody stepping into a car with a rifle. These are all the sort of things that almost any hunter and any firearms person would be, would know can occur and the gun can fire. Not a misfire, but an uncareful, an unsafe, a negligent misfire by the individual holding the gun. In fact, what has to happen, Your Honor, is that the person has to know to ask the question. The person has to know to investigate. And the fact is that Remington made very careful, according to this complaint which is taken as true, Remington made very careful, took very careful steps to make sure nobody would know to make the inquiry. Your complaints indicate that you presumed a trigger pull. And you used the word presumed. Do you know now that the triggers were not pulled? That's our belief. On what basis? On the basis of the superb investigation done by CNBC, of our knowledge now that we are not alone, that, in fact, this occurred in many different places and many different times, five times a day for 13 years. But there's no way an individual would ever know that. And the reason they wouldn't know is because the district court on that point said both victims, plaintiffs, knew that they'd been shot. And, therefore, it was within their capacity to ask the shooter what happened. And if the shooters had been questioned, we don't know what the answer would be, at least unless there's evidence that you did ask the shooters finally. I can't remember. But I take your point that there's, you know, the natural reaction is there's a hunting accident, you know, something jostled and it went off. But that was the district court's focus, as to you had within your ability to ask the persons who held the guns what happened. What's your response to that? Well, again, we're dealing at the pleading stage. But you really have to know. Why isn't that responsive to you said? You have to know to ask, make the inquiry. So that's where you're talking, and that's another question I have, as to what the claim is here under the Montana law. But your premise is you have to know to ask the question, and the district court seemed troubled that you didn't ask, apparently, the person who held the gun. Well, of course, we have no depositions here, so that hasn't been developed. But the fact of the matter is, is that after somebody shoots somebody, because that's how it looks to the individuals involved on the day of the accident, after somebody shoots somebody, the last thing you would do, Your Honor, is to turn around and ask the most obscure question of all. What's that? Why did it go off? Did the gun fire off? Did the gun go off and you do nothing? Did you do nothing and the gun go off? No. I think the question is, what happened? What happened? That is the question. What happened? Well, it's not an obscure question. I mean, that's what you would ask. Jeez, what happened? And the person will say, God, I was claiming the gun, and I don't know what happened. That's probably the exact issue the jury will have to deal with, because that's truly a question of fact, and we as lawyers and judges can't really decide that, and not in the context of no discussion. Montana courts, haven't they looked at this? Don't we have to look at how Montana courts have decided and what they've ruled with respect to these issues? I think so. You agree with that? Well, I think so, yes, of course. Those are the statutes that control us here and in this case. So, I mean, a lot of the cases from Montana seem to indicate that, what you're trying to argue is that the injury was somehow hidden. From how I read the decision, it seems like the Montana courts, when they credit hidden injuries, it means latent injuries, injuries that were somehow suppressed or didn't come to light until later. Here, the injury, doesn't it relate to the fact that the gun went off and then someone was injured? I think when you take a look at the Montana decisions, Your Honor. Which one do you want me to look at? Because I'm very curious. Oh, I think we're going to probably talk at much, okay? That, first of all, in much we deal in a case that is far more developed than this one. Much is a summary judgment motion. In much, the district court applied Montana law to facts that seem to be on all fours. With those presented here, the plaintiff was shot and injured by a holstered revolver in 1975, but waited until 79 to file a products liability action against the gun manufacturer. And the plaintiff thought and argued that the delay should be excused by the discovery doctrine because he did not discover and reasonably should not have discovered that the legal cause of his injury was a defect in the revolver, and the court rejected this argument, reasoning that discovery rules similar to that urged by the plaintiff have been limited to latent injuries. And I just don't see how is this a latent injury? What happened in both of your cases? Well, of course, the world changed in Montana after 1987 when there was a change in the statute. The change in the statute was seminal. It was a very important change. Prior to that, Montana really had a statute that had drawn out of the malpractice venues and talking about latent injuries. But here now Montana has to look for the first time at not only the injury. It has to look at its cause. And the fact is that surely on a 12 v. 6 motion where all the dice are held, all the cards are held by a defendant, all the evidence is held by a defendant, and we can see how important that is. Well, is there any limit then to the fraudulent concealment or discovery doctrines? I mean, what if the CNBC documentary had not been released until 50 years after the injuries? You think then that's okay? Well, I don't know if Montana has a statute of repose. But that might have something to do with it. The second thing is you're looking better than I am. I'm sorry, Your Honor. If you want to save some time for rebuttal, you should. I think I will. It's a new procedure for me in the Second Circuit. It's not done this way. But I'll know for next time. Thank you, Your Honor. May it please the Court, Counsel. My name is Bob Carlson. I am from Butte, Montana. And the Court's questions to this point have essentially tracked not only the defendant's briefing but also the district court's order. Could I get you to focus on what the counsel adverted to? I don't want to throw you off your argument, but we haven't been really talking about the statute itself much.  The counsel said it's not just the injury, it's the claim. The period of limitation, when I'm looking at 27-2-102, it says the period of limitation does not begin on any claim or cause of action for an injury to a person until the facts constituting the claim have been discovered or in the exercise of due diligence should have been discovered. Now, the claim in this case, as I understand it, is a product defect. It's not a latent injury. It's a product defect that their theory is was known to Remington and who took active steps to suppress that leaking out. So under the circumstances that we were quizzing your colleague about, he says you need to know what question to ask. And as I said, the district court seemed to focus on the fact that they knew they were injured. Yeah, I mean, they were shot. But the statute doesn't seem to focus on the injury.  And it says in 3B, whether the concealment is before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause. And that doesn't seem to be addressed by Judge Siebel's reasoning. So can you explain to me how Montana interprets claim or cause? First of all, there's nothing in Montana law except in malpractice actions where fraudulent concealment without interaction between the defendants and a plaintiff has been found to bar the statute. Well, I'm just looking at the statutory. I just want to know how they interpret claim or cause. Then you can get into the other. The interpretation is the injury itself and what caused the injury. And here the cause of the injury was being shot by a rifle. Plaintiff's sort of clever use of the term presumption essentially precludes them from ever being able to state a claim in Montana. The courts have never interpreted this to be a situation where you can sit on your rights after knowing why you were injured, exactly why you were shot with a high-powered rifle. But the plaintiff says he doesn't know why the rifle went off. Well, but the plaintiff can't just sit around and do nothing. The fact that you were shot triggers your obligation to exercise due diligence under Montana law. There's been no case in Montana that's abrogated the due diligence requirement. Here plaintiffs say they presumed there was a trigger pull. But there's no allegations that the plaintiffs asked the shooter, did you activate the trigger? Was your finger on the trigger? What happened? Was this an accident? That does not take, in fact, that is the most common sense thing in the world. How did this happen? Where was your hand? What happened to the trigger? Was it on safety? Did you pull it? None of those questions were asked here. Had they been asked, then that triggers the duty to investigate. None of these questions were asked here. Is there some allegation in the complaint, which was the 12B6 Act, says we didn't ask these questions? No. Certainly there's the lack of the allegation. They presumed a trigger activation. That's the allegation in the complaint. We presumed a trigger activation. You can't presume something like this. These are basic facts. That isn't due diligence. That's the exact opposite of due diligence. And the Buell case in Montana, which is cited at page 14 of our brief, has explained that it has long been the law in Montana that a plaintiff cannot rely on a claim that he had no knowledge of his right to sue for the fact that a person entitled to an action has no knowledge of his right to sue or the facts out of which his right arises. Indeed, if the court adopts that rule, the issue of when the cause of action accrued would not be resolved until the jury returned a verdict with the answer to the ultimate issue of causation. And that's not Montana law. Montana law clearly requires a plaintiff who knows the cause of action accrues on the day of the injury. When you say Montana law, what are you referring to, Monroe? I'm referring to the statute, which was a codification of much. And Monroe ---- Because Monroe predates it. It does, but ---- I'm trying to figure out what effect or authority does Monroe still have at this point, and is there any other cases? Well, it still has authority in the terms of a tort setting, not necessarily in terms of a medical malpractice setting, because the legislature dramatically changed the medical malpractice statute to say you ---- it used to be that the due diligence was there and you had to ---- there had to be a fraudulent concealment, the doctor had to keep you from finding out. Now the statute says if the doctor knows something, they have to tell. But there's never been that duty in a non-malpractice setting in Montana. And in ---- at HKM Associates, which is cited at our brief at page 21, the HKM decision requires an affirmative act be committed by the defendant, which is calculated to obscure the existence of a cause of action. That is still good law. There has to be ---- there has never been a case in Montana that requires a defendant without ---- The allegations are that Remington knew about complaints about misfirings of guns and didn't make that knowledge available to the public. Isn't that sufficient interaction between the defendant preventing ---- of the cause of the accident? No, Your Honor, not in Montana. Montana law does not require a defendant to publicize potential defects in his rifle. What the plaintiffs allege in their complaint is the fraudulent concealment, they essentially plead themselves out of a case. First of all, they know they've been shot. They do nothing, not just for three years, in the case of Humphrey, for 23 years. They do nothing. They don't ask. There's no allegation that they asked the shooter. There's no allegation that they did anything. Plaintiffs argue that fraudulent concealment is Remington asked for protective orders during discovery and already filed cases. Well, let me ask you about that because assuming appellants had inquired with Remington about the design of their rifles, what would they have discovered? It seems like they're arguing that Remington would have hindered their investigation, covering up the alleged defect, and I'm just trying to figure out if this is enough to support a finding of fraudulent concealment. It is not. First of all, you have to ask the question. They use the stonewall analogy in their briefing, and that Remington would put up this stonewall. First of all, plaintiffs never went to look for the stonewall, never contacted Remington, never did anything, never approached the stonewall, don't even know if it existed. And it's really interesting that when you allege allegations of complaint, that the reason that this was concealed was because in other cases, now that's the operative word, in other cases where people actually, within the statute of limitations, filed an action, sought discovery, and were provided documents pursuant to protective orders. And then these cases, as is not unusual, settled with confidentiality provisions. Those are the allegations and the complaints. So if you take those as true, what is different about that than anything else? What precluded those individuals from filing a lawsuit and obtaining this information? Nothing. The same nothing that didn't stop, if you'll pardon the double negative, didn't stop the plaintiffs here from inquiring. You cannot sit idly when you know you've been injured, and you know the cause of the injury. We're not talking legal cause, Your Honor. We're not talking legal cause. We're talking the cause of the injury. That's a bullet striking you. That's the cause of the injury. And I think the difference between legal cause and the cause, talk about that. And where does Montana truly highlight that? In the Buhl decision, which I alluded to earlier. Which one? I'm sorry. Buhl versus BioSearch Medical Products. It's a Montana 1985 case, but basically says that you can't just sit on your rights. It's not the legal cause. It's the cause of the injury. And there's never been a case in Montana, except for medical malpractice cases, where fraudulent concealment has been applicable or held to apply in interpreting these statutes, unless there's been some interaction between the plaintiff and the defendant. There is no duty to disclose. If the district court got it exactly right, long-time practitioner in the state of Montana, long-time products liability practitioner, very seasoned judge, knows the law in Montana and got it right. There was no change in the law in Montana when they codified essentially the much rationale. And there is an obligation, there's always a duty of due diligence in a strict liability case or in a negligence case to proceed forward. And to say this, I don't ask the shooter what happened. Does that mean that now if I find out, if I do a test and I find out that the trigger doesn't pull, that I still have a cause of action against the shooter, because obviously he pulled the trigger? Are we going to delay it for that long? That's just not the law. They are on notice inquiry of what happened here. They are required to proceed diligently. What they did, a presumption of something is the opposite of due diligence. It is something that has never been permitted in Montana. And to try to extrapolate out and say that just because I didn't know the legal cause or that I might have had a cause of action, that still doesn't stop the due diligence requirement. You are required, once you have the injury accrued on the day of the shooting, there's been no allegation in the complaint of any contact with Remington, of any Remington trying to hide the fact that they were injured by a Remington rifle. It was printed on the side of the rifle. They knew they were injured with a firearm. They know who made the firearm, and they know who to contact. They did none of those things. Now, the cases they cite for the concealment issue they cite really belies their argument, because obviously other people in other situations have filed lawsuits, conducted the investigation and pursued the claim. To say I presume something happened and therefore I didn't do anything has never been the law in Montana. It's never been permitted, and there would never be a statute of limitations. It would never exist. All you have to do is say, oh, didn't know, and just sit there and wait. Well, does what a diligent plaintiff would have done, does that frame a factual question for a jury? No, Your Honor. They did not act with due diligence within the timeframe of the statute. That's why the statute is there. They have to do something. That's your assertion, but what is diligence under the circumstances? Isn't that a little bit like what is reasonable care under the circumstances? I don't. The statute's never been interpreted like that in Montana, Your Honor. It's you know the injury. Well, it's never been interpreted as a legal question for the trial judge to determine. In the way this has been pled, yes, it is. And regardless of the stage of pleadings, there's nothing that can be done that helps them here. They say we want discovery so we can ask the question of the shooter. Did you pull the trigger? Well, that's 23 years in Humphrey's case too late and five or seven years too late for Barrer's. I mean, that is a question you ask right away. What the heck happened? And that's, they know they've been shot. That's where the cause of action accrued, right then. What do you think, if we play this out, unfortunately we don't have these facts, 12B6, but the normal reaction would be perhaps to say, what happened? And the shooter says, I don't know. I just, the gun went off. And that, how that still triggers. What would be the next common sense place to go? I would take it to a gunsmith and find out if there was something wrong with it. Or I would call Remington. I would do something. You have to take action. That's what due diligence is. They did nothing. They pled. They did nothing. Their pleading and the lack of the allegations in their complaint kill their cause of action. And that's exactly what Judge Siebel found. I think I'm out of time. Thank you. Mr. Braxton, why don't you answer your learned friend's argument that other people file timely, which led to the discovery orders of which you complain and the settlements of which you also complain? It's hard for me to discuss the facts of cases that are not before the court, that it dehorses the record. But I feel like Alice in Wonderland, because those are cases that are under confidentiality agreements. Those are cases where the discovery is under protective order. So, yeah, I agree. I don't know what happened in those cases. And that's part of the problem. That is part of, a jury could find, part of the actions and the scheme of Remington to keep them. Why don't you answer or respond to Mr. Carlson's last statement that, you know, why didn't you inquire? Why didn't you take it to the gunsmith? Why didn't any of these steps take place? I don't think any of those things are necessary. The complaint says that they presumed that it fired because of a trigger pull. And that is sufficient for these purposes today. And what's your best authority that that's sufficient, that you can just sit? I haven't heard a single case that said it's not. So you don't have a case that says it does, but because there's a case that does says it's not, that's why. Well, I think it's not for pleading purposes, even under Rick Ball and Twombly. I think it's more than sufficient. In your brief, you kind of, it's not clear if you're relying on delayed discovery or the fraudulent concealment. You sort of mix up the two. Which are you relying on? Well, I think it's fraudulent concealment here. And I just wanted to, Your Honor, to ask the question about is there any limit to the statute of limitations? And, of course, there is a limit. It's three years. See, here the plaintiff does not control. So it would be 50 years plus three if the documentary had not come out and for 50 years. Only, only, it only extends when the person who has the ability to extend it does something. And that's Remington. If Remington did not fraudulently conceal, if a jury finds that Remington did not fraudulently conceal, that statute of limitations is over. So we don't have any control of that, but Remington does. And the fact of the matter is that those questions having to do with fraudulent concealment in Montana, under Johnston, under Dragon, Burvey and Sebecker, I'm probably pronouncing it wrong, are all deemed questions of fact for a jury. Every single one of them. Thank you, sir. Every single court in Montana. I think we've run out of time. The Court thanks counsel for their argument, and the case of Humphrey v. Remington is submitted. Thank you, Your Honor.
judges: Fisher, Bea, Murguia